# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Michael Haynes & Associates, LLC,

v.                                                     CA No. 1:20-cv-10389

Security Credit Services, LLC d/b/a EquiPro
Investments and EquiPro Holdings, LLC

## **COMPLAINT**

Plaintiff, Michael Haynes & Associates, LLC ("MHA") brings this complaint against Defendants Security Credit Services, LLC d/b/a EquiPro Investments and EquiPro Holdings, LLC and alleges as follows:

## **PARTIES**

1.      Michael Haynes & Associates, LLC ("MHA") is a Massachusetts limited liability company with a principal place of business at 21 Brook Street, Suite 9, Seekonk, MA 02771.

2.      Security Credit Services, LLC ("SCS") is a Mississippi limited liability company with a principal place of business at 306 Enterprise Drive, Oxford, MS 38655.

3.      EquiPro Investments is a fictious name used by SCS.

4.      EquiPro Holdings, LLC ("EquiPro Holdings") is a Mississippi limited liability company with a principal place of business at 306 Enterprise Drive, Oxford, MS 38655.

5.      SCS holds itself out to the public as being owned and operated by EquiPro Holdings. <u>See</u> SCS webpage attached as **Exhibit 1**.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of these proceedings pursuant to 28 U.S.C. § 1332, as this is an action between corporate citizens of different states, with an amount in controversy in excess of $75,000, exclusive of attorneys' fees, interests and costs.

7.      Venue is proper in this forum under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts.

8.      Defendants have sufficient contacts with this jurisdiction such that personal jurisdiction exists over the Defendants.

9.      Defendants' representatives, and thus Defendants, were physically present in Massachusetts on July 19, 2018 and November 4, 2018 and met with Mr. Halzel regarding the transactions that form the subject matter of this Complaint.

## FACTS

10.     SCS holds itself out as "a nationally known and trusted investment firm which purchases both performing and non-performing accounts receivable."

11.     Kaye Dreifuerst is president of SCS ("Kaye").

12.     T.K. Kimmel is an executive vice president of SCS ("T.K.").

13.     Non-party Time Payment Corp. is in the business of commercial financing (including equipment financing) with a principal business address of 1600 District Avenue, Suite 200, Burlington, MA 01803 ("Time Payment").

14.     SCS and Time Payment had a business relationship under which Time Payment sold certain accounts receivable to SCS.

15.     MHA is in the receivables management industry and regularly buys and sells portfolios of accounts receivable.

16.     Michael Halzel is president of MHA.

17.     MHA's primary contact at SCS was T.K.

18.     MHA and SCS had a business relationship lasting over 7 years during which the parties entered into numerous transactions.

19.     As an executive vice president, T.K. had authority to speak on behalf of and bind SCS.

20.     MHA believed that, T.K. had authority to speak on behalf SCS and bind SCS because T.K. was an executive vice president of SCS at all times relevant hereto.

**PORTFOLIO 1**

21.     In April 2018, SCS and MHA preliminarily discussed SCS selling to MHA a portfolio of accounts receivable involving loans from Time Payment in the approximate principal amount of $25,008,728.35 ("Portfolio 1").

22.     On April 3, 2018, SCS represented to MHA that the average balance of the accounts in Portfolio 1 was $7,000. See Email dated April 3, 2018 attached as **Exhibit 2**.

23.     On or around April 4, 2018, SCS represented to MHA that each of the underlying accounts receivable in Portfolio 1 were commercial leases with personal guaranties. See Email dated April 4, 2018 attached as **Exhibit 3**.

24.     On April 4, 2018, SCS represented to MHA that the accounts receivable in Portfolio 1 came with applications and statements. See Email dated April 4, 2018 attached as **Exhibit 4**.

25.     In a phone conversation in or around mid-May, 2018, T.K. further represented to MHA that each account receivable in Portfolio 1 came with an application, payment history, driver's license, and invoice receipt sheet.

26.     On May 7, 2018, MHA expressed interest in Portfolio 1 to SCS and expressed a willingness to buy a small "tester" component of Portfolio 1 in the amount of $20,000. <u>See</u> Email dated May 7, 2018 attached as **<u>Exhibit 5</u>**.

27.     On May 7, 2018, T.K. told MHA to "find more money" and that T.K. was "not looking for someone that wants to 'test it' I am looking for a partner." <u>See</u> **<u>Exhibit 5</u>**.

28.     On or around May 16, 2018, SCS represented to MHA that Time Payment originated all the loans for the accounts receivable in Portfolio 1. <u>See</u> Email dated May 16, 2018 attached as **<u>Exhibit 6</u>**.

29.     MHA discovered after receiving Portfolio 1 that Time Payment did not originate all the loans in the accounts receivable in Portfolio 1.

30.     On May 16, 2018, MHA again asked about the underlying documentation for the accounts in Portfolio 1.

31.     SCS represented to MHA that each of the accounts would have "Copy of Driver's License, application etc. underlying agreement, pay histories, invoice receipt sheet." <u>See</u> **<u>Exhibit 6</u>**.

32.     On May 21, 2018, MHA requested media samples from SCS. <u>See</u> Email dated May 21, 2018 attached as **<u>Exhibit 7</u>**.

33.     On May 21, 2018, SCS sent media samples to MHA, which included a copy of driver's license, application etc. underlying agreement, pay histories, invoice receipt sheet. <u>See</u> Email dated May 21, 2018 at 9:20am attached as **<u>Exhibit 8</u>**.

34.     Despite representing to MHA that it would receive "Copy of Driver's License, application etc. underlying agreement, pay histories, invoice receipt sheet" SCS provided to MHA only a copy of the application and an incomprehensible excel spread sheet.

4

35.     The media samples provided to MHA were not representative of the accounts receivable in Portfolio 1.

36.     Prior to sending a draft contract for Portfolio 1, SCS represented to MHA that it would remove bankrupt or deceased accounts from Portfolio 1.

37.     On June 6, 2018, SCS provided a contract to MHA purportedly memorializing the sale of Portfolio 1 to MHA. See Email dated June 6, 2018 attached as **Exhibit 9**.

38.     In a phone conversation on or around June 6, 2018, T.K. represented to MHA that there would be no provision in the contract that prohibited MHA from reselling any of the accounts receivable in Portfolio 1 (also known as a "re-sale restriction").

39.     Despite advising MHA differently, SCS included a re-sale restriction in the contract for Portfolio 1. See Purchase Agreement attached as **Exhibit 10**, Sec. 5.6.

40.     MHA questioned the re-sale restriction by email on June 6, 2018, and T.K. responded saying "your [sic] right good catch let me change it real quick" and "its [sic] 12 months with approval." See Email dated June 6, 2018 at 12:45pm attached as **Exhibit 11**.

41.     Despite T.K. representing to MHA that there was no re-sale restriction, then representing it was "12 months with approval," SCS put different language into the contract.

42.     Prior to presenting a draft contract to MHA, SCS never informed MHA that SCS intended to sell Portfolio 1 to MHA with a clause prohibiting MHA or its assignees from threatening or pursuing litigation to collect the accounts receivable (also known as the "litigation-hold provision").

43.     MHA was surprised by the litigation-hold provision when SCS first presented the draft contract because SCS had not mentioned the litigation-hold provision until it asked MHA to sign the contract. See **Exhibit 10**, Sec. 5.8.

44.     On June 6, 2018, MHA questioned the litigation-hold provision by email to SCS.

45.     In a phone conversation on or around June 6, 2018, T.K. told MHA that the litigation-hold provision would be removed within 90 days of executing the contract.

46.     T.K.'s representation that the litigation-hold provision would be removed was made near the time of execution and induced MHA to sign a purchase and sale agreement for Portfolio 1, a copy of which is attached as **Exhibit 10** (the "First Agreement").

47.     The purchase price for Portfolio 1 was $300,104.74. See **Exhibit 10**.

48.     After the parties executed the First Agreement, MHA repeatedly followed up with SCS regarding removal or waiver of the litigation-hold provision (as promised).

49.     SCS repeatedly represented to MHA that it would remove or waive the litigation-hold provision.

50.     After the parties executed the First Agreement, SCS made a clear promise to MHA that SCS would remove or waive the litigation-hold provision.

51.     In a text exchange on June 29, 2018, MHA asked T.K. "Are you worried that you're not going to be able to get the no litigation claws [*sic*] removed?"

52.     T.K. responded "Not worried."

53.     A portion of the text exchange is attached as **Exhibit 12** (with potentially offensive language redacted).

**FORWARD-FLOW CONTRACTS/SECOND PORTFOLIO**

54.     Also in June 2018, and contemporaneous with the dialogues about Portfolio 1, SCS and MHA discussed the sale of a second portfolio of accounts receivable involving loans from Time Payment under which SCS would transfer smaller trenches of accounts receivable to MHA on a monthly basis (also known as a forward flow contract), with such trenches including

6

accounts receivable in the approximate principal amount of $1,800,000 to $5,000,000 per month ("Portfolio 2").

55.     On or about July 9, 2018, the parties executed a purchase and sale agreement for Portfolio 2, a copy of which is attached as **Exhibit 13** (the "Second Agreement," and together with the First Agreement, collectively referred to as the "Agreements").

56.     After the execution of the Second Agreement, SCS promised MHA that the litigation-hold provisions would be removed.

57.     On July 20, 2018, Kaye emailed MHA regarding the removal of the litigation-hold provisions stating that "I'll send you an email on Monday in reference to the legal criteria that I'll get approved with the Client. With this change, I think this product will work really well for both your group and mine…" See Email dated July 20, 2018 attached as **Exhibit 14**.

58.     On numerous occasions, SCS reassured MHA that the litigation-hold provisions would be removed.

59.     On October 12, 2018, in response to MHA again asking when the litigation-hold provisions would be removed, T.K. said "I know it's not the immediate green light we/you are looking for…" See Email dated October 12, 2018 attached as **Exhibit 15**.

60.     T.K.'s statement acknowledges that SCS promised MHA that the litigation-hold provisions would be removed. See **Exhibit 15**.

61.     During conversations with MHA in November 2018, T.K, promised MHA that if the litigation-hold provision was not removed, T.K. would find a buyer for both Portfolios at or around the same purchase price paid by MHA.

## COUNT 1 – FRAUD IN THE INDUCEMENT

62.     MHA incorporates and realleges the paragraphs above as if set forth fully herein.

63.     At or near the execution of the Agreements, SCS made false representations of material fact, including but not limited to, that:

    a.      SCS would provide to MHA certain documentation underlying the accounts receivable, including applications, payment histories, copy of driver's license, and invoice receipt sheets;

    b.      The media samples provided to MHA on May 21, 2018 were a representative sample of the information available for the accounts;

    c.      Time Payment was the originator on all the loans for the accounts receivable;

    d.      Portfolio 1 and Portfolio 2 did not include bankrupt or deceased accounts;

    e.      There would be no re-sale restriction;

    f.      The litigation-hold provisions would be removed or waived within 90 days; and

    g.      All the accounts were valid, binding and enforceable obligations.

64.     At or near the execution of the Agreements, SCS omitted material facts, including but not limited to, that:

    a.      SCS could not or would not remove the litigation-hold provision;

    b.      Time Payment was not the originator on the loans underlying the accounts receivable;

    c.      The accounts receivable documentation did not include payment histories, copy of driver's license, and invoice receipt sheets;

      d.      Both portfolios included bankrupt and deceased accounts;

      e.      Both portfolios included accounts that had issues with fraudulent guarantor signatures, unposted payments, faulty repossessions; and

      f.      Accounts in both portfolios were already closed for fraud before SCS sold them to MHA.

65. SCS knew the falsity of its representations and omissions at the time those statements and omissions were made.

66. SCS's misrepresentations and omissions of material facts were made for the purpose of inducing MHA to enter into the Agreements.

67. SCS's misrepresentations and omissions impair the value of the accounts receivable transferred under the Agreements.

68. SCS knew and intended that the MHA would rely upon SCS's misrepresentations and omissions.

69. MHA reasonably and justifiably relied to its detriment on SCS's representations and omissions, and thus was induced to enter into the Agreements.

70. As a direct and proximate cause of SCS's misrepresentations and omissions material to the subject matter of the Agreements, MHA has suffered damages, including but not limited to, loss of the benefit of the bargain; loss of resale value, lost profits, and all other damages in an amount to be proven at trial.

## COUNT 2 – FRAUDULENT MISREPRESENTATION

71. MHA incorporates and realleges the paragraphs above as if set forth fully herein.

72. At or near the execution of the Agreements, SCS made false representations of material fact, including but not limited to, that:

9

a.  SCS would provide to MHA certain documentation underlying the accounts receivable, including applications, payment histories, copy of driver's license, and invoice receipt sheets;

b.  The media samples provided to MHA on May 21, 2018 were a representative sample of the information available for the accounts;

c.  Time Payment was the originator on all the loans for the accounts receivable;

d.  Portfolio 1 and Portfolio 2 did not include bankrupt or deceased accounts;

e.  There would be no re-sale restriction;

f.  The litigation-hold provisions would be removed or waived within 90 days; and

g.  All the accounts were valid, binding and enforceable obligations.

73.  At or near the execution of the Agreements, SCS omitted material facts, including but not limited to, that:

a.  SCS could not or would not remove the litigation-hold provision;

b.  Time Payment was not the originator on the loans underlying the accounts receivable;

c.  The accounts receivable documentation did not include payment histories, copy of driver's license, and invoice receipt sheets;

d.  Both portfolios included bankrupt and deceased accounts;

a.  Both portfolios included accounts that had issues with fraudulent guarantor signatures, unposted payments, faulty repossessions; and

b.  Accounts in both portfolios were already closed for fraud before SCS sold them to MHA.

74.     SCS knew the falsity of its representations and omissions at the time those statements and omissions were made.

75.     SCS's misrepresentations and omissions of material facts were made for the purpose of inducing MHA to enter into the Agreements.

76.     SCS's misrepresentations and omissions impair the value of the accounts receivable transferred under the Agreements.

77.     SCS knew and intended that the MHA would rely upon SCS's misrepresentations and omissions.

78.     MHA reasonably and justifiably relied to its detriment on SCS's representations and omissions, and thus was induced to enter into the Agreements.

79.     As a direct and proximate cause of SCS's misrepresentations and omissions material to the subject matter of the Agreements, MHA has suffered damages, including but not limited to, loss of the benefit of the bargain; loss of resale value, lost profits, and all other damages in an amount to be proven at trial.

## COUNT 3 – NEGLIGENT MISREPRESENTATION

80.     MHA incorporates and realleges the paragraphs above as if set forth fully herein.

81.     At or near the execution of the Agreements, SCS made false representations of material fact, including but not limited to, that:

a.  SCS would provide to MHA certain documentation underlying the accounts receivable, including applications, payment histories, copy of driver's license, and invoice receipt sheets;

b.  The media samples provided to MHA on May 21, 2018 were a representative sample of the information available for the accounts;

c.  Time Payment was the originator on all the loans for the accounts receivable;

11

      d.  Portfolio 1 and Portfolio 2 did not include bankrupt or deceased accounts;

      e.  There would be no re-sale restriction;

      f.  The litigation-hold provisions would be removed or waived within 90 days; and

      g.  All the accounts were valid, binding and enforceable obligations.

82.    At or near the execution of the Agreements, SCS omitted material facts, including but not limited to, that:

      a.  SCS could not or would not remove the litigation-hold provision;

      b.  Time Payment was not the originator on the loans underlying the accounts receivable;

      c.  The accounts receivable documentation did not include payment histories, copy of driver's license, and invoice receipt sheets;

      d.  Both portfolios included bankrupt and deceased accounts;

      a.  Both portfolios included accounts that had issues with fraudulent guarantor signatures, unposted payments, faulty repossessions; and

      b.  Accounts in both portfolios were already closed for fraud before SCS sold them to MHA.

83.    SCS made the representations and omissions without exercising reasonable care in communicating the information to MHA.

84.    MHA reasonably and justifiably relied to its detriment on SCS's representations and omissions, and thus was induced to enter into the Agreements.

85.    SCS's misrepresentations and omissions impair the value of the accounts receivable transferred under the Agreements.

86.     As a direct and proximate cause of SCS's misrepresentations and omissions material to the subject matter of the Agreements, MHA has suffered damages, including but not limited to, loss of the benefit of the bargain; loss of resale value, lost profits, and all other damages in an amount to be proven at trial.

### COUNT 4 - PROMISSORY ESTOPPEL

87.     MHA incorporates and realleges the paragraphs above as if set forth fully herein.

88.     After executing the First Agreement, SCS made a clear and definite promise to MHA that SCS would remove or waive the litigation-hold provision within 90 days of executing the First Agreement.

89.     It was foreseeable that SCS's promise to remove the litigation-hold provision within 90 days would induce MHA to enter into the Second Agreement.

90.     MHA reasonably relied on SCS's promises when it entered into the Second Agreement.

91.     After executing the Second Agreement, SCS made a clear and definite promise to MHA that SCS would remove or waive the litigation-hold provision.

92.     It was foreseeable that SCS's promise to remove the litigation-hold provision within would induce MHA to pay SCS for multiple trenches of accounts receivable under the Second Agreement.

93.     MHA reasonably relied on SCS's promises when it paid SCS approximately $100,000 in the aggregate for multiple trenches of accounts receivable after the Second Agreement.

94.     As a direct and proximate result of SCS's promises, MHA has suffered damages, including but not limited to, loss of the benefit of the bargain; loss of resale value, lost profits, and all other damages in an amount to be proven at trial.

13

## COUNT 5 - VIOLATION OF MASS. GEN. LAWS CH. 93A § 11

95.     MHA incorporates and realleges the paragraphs above as if set forth fully herein.

96.     SCS is a Receivables Management Association ("RMAI") member.

97.     According to RMAI's website, RMAI is "the nonprofit trade association that represents more than 550 companies that support the purchase, sale, and collection of performing and nonperforming receivables on the secondary market" and "RMAI's Receivables Management Certification Program and its Code of Ethics set the global standard within the receivables industry due to its rigorous uniform industry standards of best practice which focus on the protection of the consumer."

98.     RMAI maintains a code of ethics to govern the conduct of its members.

99.     According to RMAI's website, "RMAI's Code of Ethics is a written set of norms governing the professional conduct and behavior expected of its Members and their employees/agents. Failure to comply with the Code is a basis for invoking a disciplinary process."

100.    According to SCS's website, "Kaye was voted onto the Board of Directors for RMAi in 2008, an organization that plays an important role in providing leadership and guidance for the debt buying industry. She served as President for the RMAi and is still very involved with legislation meetings which help guide the industry."

101.    Brett Soldevila, who is SCS's chief compliance officer, is on the board of directors of RMAI.

102.    At all relevant times hereto, MHA and SCS were engaged in trade or commerce as defined under Mass. Gen. Laws ch. 93A.

103.    The above-described actions of SCS, including but not limited to SCS's misrepresentations and omissions, constitute "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, §§ 2 and 11, and are therefore unlawful.

104.    SCS, whose personnel are former and present RMAI leadership, agreed to conduct its business in accordance with RMAI's code of ethics.

105.    It is unfair and deceptive for SCS to agree to conduct its business in accordance with the RMAI code of ethics and subsequently violate the RMAI code of ethics as described herein.

106.    It is unfair and deceptive for SCS to induce MHA to enter into the Agreements by making false statements and promises SCS never intended to keep.

107.    The above-described actions of SCS occurred primarily and substantially within the Commonwealth of Massachusetts where MHA is headquartered.

108.    SCS's violations of Mass. Gen. Laws ch. 93A were willful and/or knowing violations of said statute and SCS is therefore liable to MHA in an amount equal to not less than twice and up to three times SCS's damages by reason of its violations of Mass. Gen. Laws ch. 93A.

109.    MHA is also entitled to an award of reasonable attorneys' fees and costs incurred in this action as a result of SCS's violations of Mass. Gen. Laws ch. 93A, §§ 2 and 11.

110.    As a direct and proximate result of SCS's conduct, MHA has suffered damages, including but not limited to, loss of the benefit of the bargain; loss of resale value, lost profits, and all other damages in an amount to be proven at trial.

## EQUIPRO HOLDINGS

111.    SCS holds out to the public that it is owned and operated by EquiPro Holdings.

See **Exhibit 1**.

112.    As owner and operator of SCS, EquiPro Holdings is liable for SCS's conduct.

113.    By operating SCS, EquiPro Holdings is responsible for SCS's conduct.

114.    As owner and operator of SCS, EquiPro Holdings is a principal of SCS.

115.    As principal, EquiPro Holdings is liable for SCS's conduct as agent.

### PLAINTIFF CLAIMS A TRIAL BY JURY AS TO ALL CLAIMS SO TRIABLE

WHEREFORE, Plaintiff Michael Haynes & Associates, LLC respectfully requests that the Court:

1.  Enter judgment for Plaintiff on all counts of this Complaint;

2.  Award monetary damages to Plaintiff in an amount to be proven at trial;

3.  Award attorney's fees, costs and expenses to Plaintiff;

4.  Award Plaintiff such other and further relief as this Court deems just and proper.

MICHAEL HAYNES & ASSOCIATES, LLC,

By its attorneys,

/s/ Andre S. Digou
Andre S. Digou (#683834)
Robert D. Fine (#165360)
Chace Ruttenberg & Freedman, LLP
One Park Row, Suite 300
Providence, RI 02903
Tel.: 401-453-6400
Email: adigou@crfllp.com
          rfine@crfllp.com
Dated: February 26, 2020

**EXHIBIT 1**



About Us      Services      Compliance      Leadership      Consumers      Contact

# Evolving to EquiPro Investment

In 2018 Security Credit Services made the strategic decision to modify their brand and organizational presence. EquiPro Investments was created to be the new face of the organization. This branding update has helped the company to more clearly communicate who we are, and the services we provide to our creditor partners.

# About Us

EquiPro Investments, also known and originated as Security Credit Services, is a nationally known and trusted investment firm which purchases both performing and non-performing account receivables.

Approaching our 15th year in service, we have purchased in excess of $13 billion in asset receivables and are proud to remain one of the



most known and nationally recognized brands in purchasing receivables. Security Credit Services is owned and operated by EquiPro Holdings, a privately held investment firm, which also owns and operates a portfolio of thriving financially related services companies (click here to view EquiPro Holdings' family of companies). Our core strengths reside in the trusted partnerships we create through effective communications.  We are well capitalized yet nimble and efficient in making time sensitive decisions.  We excel in our approach to data analytics and superior compliance standards

shared with clients. We remain a leading receivable
purchasing firm within our industry and hold both
our employees and client partnerships to high
standards.

# Proprietary Data Analytics

Equipro Investments has developed proprietary
processes which deliver the best service to our
clients. We use cutting-edge technology to analyze
data and make the best business decisions for our
partners and creditor partners.

# Industry Awards and Recognition

EquiPro Investments, also known as Security Credit
Services, is proud to be an active participant and
leader in the receivables management industry.
EquiPro leaders Kaye Dreifuerst (President) and
Brett Soldevila (Chief Compliance Officer) have sat
on the Receivables Management Association
International (RMAI) Board of Directors, and Kaye
has served as RMAI president. In 2019,  Kaye
Dreifuerst was among three women asked to lead
the 'Women in the Industry Reception' at the RMAI
conference. Also in 2019, Kaye was recognized as

a Top Women Leader in Accounts Receivable by Receivables Advisor. Brett Soldevila currently serves as a director for the RMAI Board and has served as Chair of the RMAI Certification Council and Standards Committee. EquiPro Investments is proud to be comprised of a team that is highly active in leadership positions within the receivables management industry. Read more about our team and their industry accomplishments here.



Phone – (866) 699-7889

Email – info@securitycreditservicesllc.com

PO Box 1156, Oxford, MS 38655



Copyright 2018 Security Credit Services, LLC | All Rights Reserved | Branding Arc | Privacy | Terms

**EXHIBIT 2**

**Michael Halzel**

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Tuesday, April 03, 2018 3:33 PM |
| **To:** | Michael Halzel |
| **Subject:** | RE: checking in |

We are closing on a pretty large commercial file (220MM) mid month

Average balance 7K

Maybe I can talk them into peeling off a piece of it day one???

How much money can you pull together?

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Tuesday, April 03, 2018 2:36 PM
**To:** T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** checking in

Do you have anything available?

I'd also take a look at personal.

Sincerely,

**Michael Halzel**
**President**
**Michael Haynes & Associates, LLC**
**508-639-9953**

NOTE: All information in this transmission is intended only for the recipient referenced above. If you have received this transmission in error, please reply to sender so that Michael Haynes and Associates, LLC. can insure proper delivery and please destroy any and all copies.





 Virus-free. www.avg.com

**EXHIBIT 3**

**Michael Halzel**

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Wednesday, April 04, 2018 9:34 AM |
| **To:** | Michael Halzel |
| **Subject:** | RE: checking in |

Its called Time Payment they are out of MASS

Its commercial leases with PG's

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Wednesday, April 04, 2018 7:43 AM
**To:** T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** RE: checking in

What's the product?

**From:** T.K. Kimmel [mailto:tkkimmel@securitycreditservicesllc.com]
**Sent:** Tuesday, April 03, 2018 3:33 PM
**To:** Michael Halzel
**Subject:** RE: checking in

We are closing on a pretty large commercial file (220MM) mid month

Average balance 7K

Maybe I can talk them into peeling off a piece of it day one???

How much money can you pull together?

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Tuesday, April 03, 2018 2:36 PM
**To:** T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** checking in

Do you have anything available?

I'd also take a look at personal.

Sincerely,

**Michael Halzel**
**President**
**Michael Haynes & Associates, LLC**
**508-639-9953**

NOTE: All information in this transmission is intended only for the recipient referenced above. If you have received this transmission in error, please reply to sender so that Michael Haynes and Associates, LLC. can insure proper delivery and please destroy any and all copies.

1

**EXHIBIT 4**

**Michael Halzel**

---

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Wednesday, April 04, 2018 9:42 AM |
| **To:** | Michael Halzel |
| **Subject:** | RE: checking in |

Yes they do

---

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Wednesday, April 04, 2018 8:58 AM
**To:** T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** RE: checking in

Do they come with application and statement?

Some of the last group of leases we got had PG's and we still got zero payments on em ☹

I would have to try them out with a small purchase before throwing in big money.

But I am interested.

---

**From:** T.K. Kimmel [mailto:tkkimmel@securitycreditservicesllc.com]
**Sent:** Wednesday, April 04, 2018 9:34 AM
**To:** Michael Halzel
**Subject:** RE: checking in

Its called Time Payment they are out of MASS

Its commercial leases with PG's

---

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Wednesday, April 04, 2018 7:43 AM
**To:** T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** RE: checking in

What's the product?

---

**From:** T.K. Kimmel [mailto:tkkimmel@securitycreditservicesllc.com]
**Sent:** Tuesday, April 03, 2018 3:33 PM
**To:** Michael Halzel
**Subject:** RE: checking in

We are closing on a pretty large commercial file (220MM) mid month

Average balance 7K

Maybe I can talk them into peeling off a piece of it day one???

How much money can you pull together?

**EXHIBIT 5**

**Michael Halzel**

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Monday, May 07, 2018 10:35 AM |
| **To:** | Michael Halzel |
| **Subject:** | RE: hey |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

We are not scheduled to fund it until the 18th of this month

Find some more money between now and then

I am not looking for someone that wants to "test it" I am looking for a partner

---

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Monday, May 07, 2018 7:27 AM
**To:** T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** hey

Lets do a deal today...$20k tester? Give me a few days to try it out?

Sincerely,

**Michael Halzel**
**President**
**Michael Haynes & Associates, LLC**
**508-639-9953**


NOTE: All information in this transmission is intended only for the recipient referenced above. If you have received this transmission in error, please reply to sender so that Michael Haynes and Associates, LLC. can insure proper delivery and please destroy any and all copies.






**EXHIBIT 6**

## Michael Halzel

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Wednesday, May 16, 2018 3:48 PM |
| **To:** | Michael Halzel |
| **Subject:** | RE: Time payment questions |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

```
-----Original Message-----
From: Michael Halzel <michaelhalzel@contactmha.com>
Sent: Wednesday, May 16, 2018 8:40 AM
To: T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
Subject: Time payment questions

Hey T.K.,

I am just trying to seal the deal here and I need a little due diligence prior.

My partner is asking a few questions about the file and I am passing them
forward:


1) If there is no guarantor or guarantor SSN is it safe to assume there isn't a personal
guarantee on account?  Yes

2) Are there co debtors on any of these accounts and if so would they be provided in the
final file?  Yes

3) Has Time Payment ever had a legal strategy and if so could there be accounts with
underlying judgments?  no

4) I assume Time Payment files a UCC on these accounts. Can u confirm and also ask if they
have UCC's saved electronically.  On some

5) Can we get statements on accounts where ending balance matches purchased amount? Deal
killer if I can't get   pay histories

6) I have a sample contract. Has the same contract been used for all the accounts? If there
are older contracts on some of the accounts can I have samples of those contracts.  Yes

7) What other media can we expect? Copy of Driver License, application etc.  underlying
agreement, pay histories, invoice receipt sheet

8) What was post charge-off strategy in past?  Were settlement letters sent for internal
collections?  In house only

9) It looks like there will be a lot of out of stat accounts. Would you be willing to take
those out of final file. We can identify them. (I would be willing to work the OOS ones
myself if it's an issue).  no

10) On any re-po's do they have all the documentation relating to repossession?  I will find
out
```

11) Did they ever 1099 any accounts?  no

12) Did Time Payment originate all these accounts or were some purchased from other sources? If some were purchased thru other sources can they be identified in final file and can we see original contract samples on a few of them.  All them

13) What is expected volume going forward on a quarterly basis? 5-15MM a month


---
This email has been checked for viruses by AVG.
http://www.avg.com

**EXHIBIT 7**

## Michael Halzel

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Monday, May 21, 2018 8:54 AM |
| **To:** | Michael Halzel |
| **Subject:** | RE: hey |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

2 seconds

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Monday, May 21, 2018 7:43 AM
**To:** T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** hey

Hey T.K.,
Just trying to wrap this up. Last request is media samples.

Sincerely,

**Michael Halzel**
**President**
**Michael Haynes & Associates, LLC**
**508-639-9953**

NOTE: All information in this transmission is intended only for the recipient referenced above. If you have received this transmission in error, please reply to sender so that Michael Haynes and Associates, LLC. can insure proper delivery and please destroy any and all copies.

 



**EXHIBIT 8**

## Michael Halzel

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Monday, May 21, 2018 9:20 AM |
| **To:** | Michael Halzel |
| **Subject:** | SampleDocs_03272018.pdf |
| **Attachments:** | SampleDocs_03272018.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Ignore the "consumer" docs and just pay attention to the commercial

Its 82 pages of docs



**EXHIBIT 9**

**Michael Halzel**

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Wednesday, June 06, 2018 12:16 PM |
| **To:** | 'Michael Halzel' |
| **Subject:** | SCS ~ MHA TP 50MM 5.6.2018 |
| **Attachments:** | SCS ~ MHA TP 50MM 5.6.2018.docx |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Here you go

Pucker up!!

TKK


---
This email has been checked for viruses by AVG.
https://www.avg.com

**EXHIBIT 10**

# PURCHASE AND SALES AGREEMENT

This Agreement is made this the <u>8th</u> day of <u>June</u> 2018, by and between Security Credit Services, LLC ("Seller"), with its principal place of business located at 2653 W Oxford Loop, Oxford, MS 38655 and Michael Haynes & Associates, LLC ("Purchaser"), with its principal place of business located at 21 Brook St.; Suite 9 Seekonk, MA 02771

WITNESSETH:

WHEREAS, Seller is the owner of certain Accounts (hereinafter referred to as the "Accounts") which include an approximate aggregate principle balance of $25,008,728.35 at the per diem rate of 1.2%.

WHEREAS, Seller is desirous of selling, and Purchaser is willing to purchase, the Accounts upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1   PURCHASE AND SALE OF THE ACCOUNTS

    1.1   Seller hereby sells, conveys and assigns to Purchaser all of its right title and interest in and to the Accounts in exchange for Purchaser's payment to Seller, via bank wire transfer, cashier's check, or money order, of the Purchase Price for the Accounts, which is identified in the Closing Statement attached hereto and incorporated herein by reference as Exhibit "B" (the "Purchase Price").

    1.2   Seller shall deliver, upon receipt from Purchaser of a bank wire transfer, cashier's check, or money order in the amount of the Purchase Price, the actual Account file(s) containing a detailed listing of the Accounts being sold to Purchaser by electronic mail. If requested by Purchaser, the actual file(s) of the Accounts will be forwarded by floppy disk or CD ROM to Purchaser within two business days of the Closing Date, as defined herein.

2   PURCHASE PRICE

    2.1   Upon execution of this Agreement, Purchaser shall   remit to Seller, via bank wire transfer, cashier's check or money order the Purchase Price. The date of Seller's receipt of the Purchase Price shall be referred to as the "Closing Date."

3   RIGHTS TO PROCEEDS

Buyer's Initials_____   MH

1

3.1     On or after the Closing Date, Purchaser shall be entitled to the proceeds of the Accounts. Should Seller come into possession of any instrument or other property from an Account debtor in payment of an Account on or after the Closing Date, pursuant to this Agreement, Seller shall monthly endorse said instrument in favor of Purchaser or transfer to said other property to Purchaser and shall deliver said instrument or other property to Purchaser within a reasonable period of time following Seller's receipt of same.

3.2     Seller hereby authorizes Purchaser to endorse, in Seller's name, and to negotiate or deposit to any bank account maintained by Purchaser, any instrument payable or endorsed to Seller and received by Purchaser from or on behalf of an Account debtor on or after the Closing Date, in payment of an Account.

4     REPRESENTATIONS OF SELLER

4.1     Seller is a Mississippi Limited Liability Company duly organized and validly existing under the laws of said state.

4.2     Seller warrants that it is the owner of the Accounts.

4.3     Accounts are valid, binding, and enforceable obligations. Seller has good and marketable title to the Accounts, and has the right to sell, convey, and assign the Accounts.

4.4     Seller has taken all action necessary to authorize its execution and delivery of this Agreement and the performance of the transaction contemplated hereby.

4.5     Any Accounts which have been discovered to be bankrupt or have an active bankruptcy filed or are deceased prior to the Closing Date shall not be included as part of the Accounts contemplated by this Agreement. If any Accounts are determined to be bankrupt or deceased, Purchaser's sole remedy shall be limited to Seller's repurchase of such Accounts for the purchase price thereof less any recoveries on such accounts that Purchaser may have received, or for which a credit was given to Purchaser. The Purchaser shall have a period of forty five (45) days from the Closing Date to return bankrupt and deceased Accounts to Seller for repurchase. Seller shall not be required to repurchase any Accounts returned by Purchaser to Seller after forty five (45) days from the Closing Date.

4.6     Any money received by Seller on any Accounts after the Closing Date shall be transferred by Seller to Buyer by statement following the end of the month. In order to assist Buyer in determining the Accounts



for which the foregoing payments were made, Seller shall also monthly provide Buyer, along with the referenced payments, a list setting forth: (i) the names of the Account debtor who tendered payments; (ii) the Account debtors' account numbers; and (iii) the amount of the Account debtors' payments.

4.7 To the extent available, and upon written request of Purchaser, Seller will provide Purchaser the type of Account debtor information outlined in Exhibit "B" hereto on each purchased Account.

4.8 Seller makes no warranties, either oral or in writing, expressed or implied, concerning the Accounts other than as specifically set forth in this Agreement. Seller makes no representations as to the percentage of collections or dollar amount, if any, to be collected on the Accounts. Seller may provide Buyer basic demographic data, including name, address, telephone number(s), social security number, date of birth, property ownership and other information. To the best of sellers knowledge, the Account data is materially accurate and complete but in no way represents that it may be the basis for successful collection efforts, but merely represents information in Seller's possession.

4.9 Seller agrees to refund any Account that is found by Purchaser, WITHIN 45 days of the Closing Date, not owed by the Account debtor due to fraud, as evidenced by an affidavit from the Account debtor or other evidence reasonably acceptable to Seller evidencing such fraudulent activity. Any account that was the subject of a consumer dispute while owned by the seller has been responded to or validated. Any Accounts that are not owed due to proper settlements verified in writing by the Originator (as defined below), Seller or agent thereof, or a copy of the canceled, final check (front and back) evidencing payment of the Account in full, will be refunded to Purchaser, when submitted in writing to Seller, for a period of time not to exceed forty five (45) days from the Closing Date.

5   REPRSENTATIONS OF THE PURCHASER

5.1 All recovery efforts instituted in connection with the Accounts shall be conducted in a good, lawful and expeditious manner. The collection activities performed by Purchaser shall be in compliance with the Federal Trade Commission standards on debt collection and other applicable state, federal and common law doctrines or laws reasonably ascertained as of the date hereof including but not limited to the Fair Debt Collections Practices Act, Fair Credit Reporting Act, and Telephone Consumer Protection Act. In this regard, Purchaser and Seller each guarantee and agree to defend each other with respect to, and indemnify each other and hold each other, including but not

limited to its employees, agents, officers, and assigns harmless from all claims, causes of action, damages, fines, penalties or costs of whatsoever nature, including reasonable attorney's fees arising from any action instituted against the other for a violation or claimed violation of law. Purchaser will strictly adhere to all requirements of the Fair Debt Collection Practices Act, Fair Credit Reporting Act, Telephone Consumer Protection Act, and any other applicable collection, credit or credit reporting laws. For any accounts where the statute of limitations has run, purchaser will not falsely represent that a lawsuit will be filed if the obligor does not pay. Purchaser acknowledges and understands that Seller's inducement to sell the Accounts is based upon such representations.

5.1(a)  Licensing: Purchaser affirms that it is has obtained any license(s), bond(s), registration(s) or permit(s) required by applicable laws and regulations to engage in purchase, management, and collection of Accounts, and Purchaser shall keep all such license(s), bond(s), registration(s) or permit(s) in full force and effect throughout the term of the Agreement. Upon demand of SCS, Purchaser shall provide SCS with copies of all current license(s), bond(s), registration(s) or permit(s) required by applicable laws and regulations to engage in purchase, management, and collection of Accounts, and to conduct business in every state in which Purchaser operates.

5.2  Purchaser is a Certified Professional Receivables Company through RMA International or meets or exceeds the standards of a Certified Professional Receivables Company and will provide sufficient proof to seller if such request is made. RMA Standards available upon request or at www.rmassociation.org.

5.2(a)  Confidentiality of Consumer Information: Purchaser affirms that appropriate data security controls and policies are in place to protect and secure confidential consumer information and that confidential consumer information shall not be disclosed or used for any purpose other than expressly provided for in the Agreement. Purchaser also affirms that confidential information is appropriately destroyed in accordance with purchaser's document retention policies.

5.3  Purchaser shall provide to Seller a copy of any bankruptcy notices on Accounts which Purchaser seeks to have Seller repurchase including, but not limited to, date of filing of bankruptcy petition, bankruptcy case number, bankruptcy court in which case filed, and type of bankruptcy. For deceased Accounts for which Purchaser seeks reimbursement from Seller, Purchaser shall provide to Seller a death certificate including date of death for deceased Account debtor. Purchaser may also provide Seller with notice of bankruptcy on an

4

Buyer's Initials

Account, including date of filing of bankruptcy petition, either from BANKO or a national credit reporting agency. In the case of a deceased Account debtor, the referenced report must contain the date of death of the Account debtor.

5.4 Purchaser has such knowledge, sophistication and experience in business and financial matters as to be capable of evaluating both the information made available with respect to the Account/Related Materials and the merits and risks of the prospective purchase, is able to bear the economic risk of such purchase, is able to bear the risk that Purchaser may be required to hold the Account/Related Material for an indefinite period of time and is able to afford a complete loss of the purchase price for the Account/Related Materials. Purchaser expressly acknowledges and agrees that Seller cannot guaranty the collection of any Account.

5.5 Purchaser has been afforded the opportunity: (i) to ask such questions as it has deemed necessary of, and to receive answers from, representatives of Seller concerning the terms and conditions of the offering of the Accounts and the merits and risks of buying the Accounts; and (ii) to obtain such additional information that Seller possesses or can acquire.

5.6 Purchaser may not sell or transfer any Charged-off Account to any Third Party Buyer without first receiving written approval from Seller. Purchaser shall conduct commercially reasonable and prudent due diligence on such RMA Certified Third Party Buyers, and or buyers that meet or exceed the RMA Certification standards and shall defend, indemnify and hold harmless Seller and Prior Holders from any and all causes of action, claims, expenses or judgments incurred by Seller for which a Third Party Buyer is partially or solely responsible.

5.7 Under no Circumstances shall Purchaser be permitted to contact either the Originator and/or previous owner of the Accounts or bank (collectively and individually referred to as "Originator) by subpoena or otherwise for any reason without first obtaining Seller's express written consent.

5.8 *Enforcement; Legal Actions.* Purchaser or its Affiliates, successors, employees, servicing agents or assigns shall not take nor indicate or imply that it will or may take any legal enforcement action against any Obligor and Purchaser shall not misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Obligor the identity of Purchaser, to the owner of the Accounts. Purchaser shall not use, adopt, exploit, or allude to Seller or any servicing agent or any name derived there from or confusingly similar therewith or the name of any

5

Buyer's Initials MH

other local, state or federal agency or association to promote Purchaser's sale, enforcement, collection, or management of the Accounts. Seller may seek the entry of an order by a court of competent jurisdiction enjoining any violation of this Section 4.7. Notwithstanding the foregoing, Purchaser may use the name of Seller for the sole purposes of identifying any Account in communications with Obligor in order to collect amounts outstanding on the Account, in connection with sale of the Account, or as required by law, rule (including court decrees) or regulation. Purchaser shall not represent that there is an affiliation or agency relationship between Purchaser and Seller, nor shall Purchaser state or represent in any way that Buyer is acting on behalf of the Seller. Out of an abundance of caution, Purchaser or its Affiliates, successors, employees, servicing agents or assigns shall not initiate any lawsuit or file suit on any Account in this Account pool to collect on any Debt.

6    MISCELLANEOUS

6.1    This Agreement is entered into, and shall be construed in accordance with the laws of the State of Mississippi. Any action arising out of, or pertaining to this Agreement, shall be commenced only in a court of competent jurisdiction in Lafayette County, Mississippi, to the exclusion of all other venues. The parties hereto further agree that in the event of any dispute regarding this Agreement, the courts of the State of Mississippi shall have and be vested with personal jurisdiction of the parties to this Agreement.

6.2    Media to be provided within 60 days of close at no cost. Additional media, to the extent reasonably available, will be provided to Purchaser upon written request from Purchaser to Seller. Media is available for a period of twelve months from the Closing Date at a charge of $12.50 per requested document. Document is defined as, among other things, affidavit. Said requests shall be prepaid at the time of each request. Media will be removed from Seller's server ninety (90) days after delivery of the Accounts to Purchaser. Purchaser acknowledges and agrees that Seller will perform its best efforts to obtain requested media documentation from the Originator. Purchaser further acknowledges and agrees that media is extremely limited, if at all available, on the Accounts. Purchaser acknowledges and agrees that Seller, despite its best efforts, may not be able to provide any media to Purchaser. Nevertheless, Purchaser specifically acknowledges and agrees that it shall first make any and all requests for media directly to Seller. Any request for media first made by Purchaser to any other entity than Seller shall be considered to be a breach by Purchaser of a material term of this Agreement.

6.3   Purchaser and any permitted assignee of Purchaser shall not use or refer to the name of the Originator or Seller, or any similar name for any purpose relating to any Account including, without limitation, the collection, promotion, marketing, advertising, sale or transfer of any Account. In collecting the Accounts, Purchaser shall only use its own name and shall not imply that it is connected or related in any manner with, or acting on behalf of, any person or entity operating under any of the foregoing names. However, Purchaser and permitted assignees of Purchaser may use the name of the Originator and Seller solely for the purposes of identifying the Account in communications with an Account debtor on such Account in identifying it, in connection with litigation with an Account debtor or in connection with entering into any servicing arrangement in identifying the Accounts. In contacting an Account debtor, filing suit, or selling the Accounts, Purchaser shall not state or represent in any way that it is taking such action on behalf of any of the aforementioned entities or their affiliates or assigns.

6.4   Seller has the right to recall an account from Purchaser at any time for any reason should the Seller's client recall such account(s) from Seller. The Purchaser will be reimbursed its purchase price for such account. Such recalls are expected to be completed by seller within 48 hours of such request.

        _____ **Buyers Initials**

6.5   In the event Purchaser fails to pay Seller the full Purchase Price on or before the Closing Date, (i) Purchaser shall be in breach of this Agreement, (ii) this Agreement may be terminated by Seller, effective immediately upon written notice to Purchaser, (iii) Upon termination of this Agreement due to Purchaser's default, Purchaser shall have no interest whatsoever, legal, beneficial or otherwise, in the Accounts, receivables, Receivable Schedules, and Account documents, (iv) Purchaser acknowledges that the actual damages likely to result to Seller from breach of this Agreement by Purchaser are difficult to estimate on the date of this Agreement and would be difficult for Seller to prove. The parties intend that Purchaser's payment of liquidated damages in the amount of ten percent (10%) of the Purchase Price (the "Liquidated Damages Amount") would serve to compensate Seller for any breach by Purchaser of its obligations under the Agreement, and they do not intend for it to serve as punishment for any such breach by Purchaser; and (v) Seller shall retain all rights and remedies to which it is entitled by law or under this Agreement, including those described in Section 6.5 hereof.

6.6   Purchaser acknowledges that Purchaser's breach of sections 5.6 and 5.7, or any other provision of this Agreement, will result in actual and substantial damages to Seller and/or Originator, the amount of which

will be difficult to ascertain with precision. Therefore, if Purchaser breaches sections 5.6 or 5.7 of this Agreement, Purchaser will be liable for payment to Seller and/or Originator the sum of $1,000 for each such breach as liquidated damages and in preventing Purchaser's further breach of this Agreement.

6.7     Purchaser warrants and represents that it shall maintain at all times or as long as collection efforts continue on the Accounts purchased hereunder, whichever is later, a phone number for consumers to contact Purchaser or Purchaser's servicer with a live voice response during the business hours no less than 8a.m. to 6p.m., Monday through Friday (except Federal Holidays) in the time zone buyer is located. Should an Obligor purchased hereunder call Security Credit Services, LLC after Security Credit Services, LLC previously directed the same Obligor to Purchaser's number listed below and noticed Purchaser in writing of such difficulty, to Obligor's inability to get a live voice from Purchaser's Entity or its Servicer, Security Credit Services, LLC shall handle the call as it deems necessary. Should a collection be made, Security Credit Services, LLC shall retain a 50% collection fee of all gross monies collected and remit to Purchaser the remaining funds.

All Obligors shall be directed to contact Purchasers at the number below:

( 508 ) 639-9953 Initial MH

6.8     Should any accounts within the current sale file be "Citibank, N.A" accounts (identified by Seller), Purchaser agrees to obtain get approval from Convoke Systems and all media requests will flow through Convoke Systems via its website (http://www.convokesystems.com/)

6.9     Interest. Purchaser shall not charge or collect interest accrued after the Closing Date on any Account. Nothing herein shall prohibit Purchaser from (i) pursuing claims for prejudgment or post-judgment interest in any legal action to collect on an Account, or (ii) pursuing collection efforts on any judgment arising there from to the extent permitted by applicable law.

6.10    Audit. Purchaser shall permit Seller or a duly assigned representative to perform audits at Purchaser's offices for the purpose of ensuring performance of the Agreement and compliance with applicable law. Such audits may be conducted at intervals deemed reasonably necessary by Seller, and with reasonable prior notice, during normal business hours.

6.11    From time to time Seller may receive updated terms from the Original Seller of the Accounts. Any such changes required by the Seller's Original Seller shall flow through to the Purchaser should any

accounts within this sale pool be affected. Purchaser agrees to honor any such requests and make any requested changes within 48 hours of notice and comply with such changes.



This Agreement constitutes the entire understanding between Seller and Purchaser. Neither party has made any representations, warranties or promises except as set forth herein.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

Security Credit Services, LLC
2653 West Oxford Loop, Suite 108
Oxford, MS 38655

Kaye Dreifuerst, President

Michael Haynes & Associates, LLC
21 Brook St. Suite 9
Seekonk, MA 02771

Michael Halzel, President

Page 10
6/8/2018No

Buyer's Initials MH

**Exhibit A**

ASSIGNMENT AND BILL OF SALE

Security Credit Services, LLC ("Seller") has entered into an Accounts Purchase Agreement, dated June 8, 2018 ("Agreement") for the sale of Accounts described in Agreement thereof to Michael Haynes & Associates, LLC. ("Purchaser"), upon terms and conditions set forth in that Agreement.

NOW, THEREFORE, for good and valuable consideration, Seller hereby sells, assigns, and transfers to Purchaser all of Seller's rights, title, and interest in each and every one of the Accounts described in the Agreement, provided however such transfer is made without any representations, warranties, or recourse.

IN WITNESS WHEREOF, Seller has signed and delivered this instrument on the _____8ᵗʰ_____ day of ___June_____, 2018.

Security Credit Services, LLC

By: _____
    President

11

Buyer's Initials MH

Exhibit B
Closing Statement

| | |
|---|---|
| **Type of Debt** **Originating Lender(s)** | Commercial TP |
| **Number of Accounts** | 3,995 |
| **State(s)** | Nationwide |
| **Face Amount (Book Value)** | $25,008,725.35 |
| **Sale Price** | $300,104.74 |
| **Closing/Funding Date** | June 8, 2018 |
| **Reference** | SCS ~ MHA 25MM TP 5.6.2018 |

Buyer's Initials ___

12

Exhibit C

Wire Transfer Instructions

The Citizens Bank
1110 Central Drive
Philadelphia, MS 39350
601-650-0067

Security Credit Services
Operating Account
2653 W Oxford Loop, Ste 108
Oxford, MS  38655-2929
**Wire ABA # 065302154**
**Account # 2578763**

Reference: SCS ~ MHA 25MM TP 5.6.2018

Please include this information on all wire transfers.  If there are any questions, please call us. Thank you.

Buyer's Initials  MH

13

**EXHIBIT 11**

**Michael Halzel**

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Wednesday, June 06, 2018 12:45 PM |
| **To:** | Michael Halzel |
| **Subject:** | RE: SCS ~ MHA TP 50MM 5.6.2018 |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Your right good catch let me change it real quick

Its 12 months with approval

-----Original Message-----
From: Michael Halzel <michaelhalzel@contactmha.com>
Sent: Wednesday, June 06, 2018 12:03 PM
To: T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
Subject: RE: SCS ~ MHA TP 50MM 5.6.2018

Hey,

There is a resale restriction?

I thought there was no resale restriction?

-----Original Message-----
From: T.K. Kimmel [mailto:tkkimmel@securitycreditservicesllc.com]
Sent: Wednesday, June 06, 2018 12:16 PM
To: 'Michael Halzel'
Subject: SCS ~ MHA TP 50MM 5.6.2018

Here you go

Pucker up!!

TKK


---
This email has been checked for viruses by AVG.
https://www.avg.com

**EXHIBIT 12**

committing to 20k a month with my proposal                     11:35 AM

Are you worried that you're not going to be able to get the no litigation claws removed?
11:38 AM

T  No I am just calling u a 
Lol                                              11:38 AM

T  Not worried    11:40 AM

But if we break it up into $20,000 purchases it will take forever for you guys to get the 300K I can sign a contract with you right now saying will buy the 300K once you get it removed
11:44 AM

T  That's why we do a swing range of 2-5mm

U can always take more

**EXHIBIT 13**

# PURCHASE AND SALES AGREEMENT

This Agreement is made this the <u>29th</u> day of <u>June</u> 2018, by and between Security Credit Services, LLC ("Seller"), with its principal place of business located at 2653 W Oxford Loop, Oxford, MS 38655 and Michael Haynes & Associates, LLC ("Purchaser"), with its principal place of business located at 21 Brook St.; Suite 9 Seekonk, MA 02771

WITNESSETH:


WHEREAS, Seller is the owner of certain Accounts (hereinafter referred to as the "Accounts") which include an approximate aggregate principle balance range of $1,800,000.00 to $5,000,000.00 per month should inventory be available at the per diem rate of 1.20%.


WHEREAS, Seller is desirous of selling, and Purchaser is willing to purchase, the Accounts upon the terms and conditions set forth herein (Exhibit D) for a term of two months to begin July 16, 2018 and continue every 30 days, concluding August 31, 2018.


NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1    PURCHASE AND SALE OF THE ACCOUNTS

    1.1    Seller hereby sells, conveys and assigns to Purchaser all of its right title and interest in and to the Accounts in exchange for Purchaser's payment to Seller, via bank wire transfer, cashier's check, or money order, of the Purchase Price for the Accounts, which is identified in the Closing Statement attached hereto and incorporated herein by reference as Exhibit "B" (the "Purchase Price").

    1.2    Seller shall deliver, upon receipt from Purchaser of a bank wire transfer, cashier's check, or money order in the amount of the Purchase Price, the actual Account file(s) containing a detailed listing of the Accounts being sold to Purchaser by electronic mail.  If requested by Purchaser, the actual file(s) of the Accounts will be forwarded by floppy disk or CD ROM to Purchaser within two business days of the Closing Date, as defined herein.


2    PURCHASE PRICE

    2.1    Upon execution of this Agreement, Purchaser shall   remit to Seller, via bank wire transfer, cashier's check or money order the Purchase Price.

Buyer's Initials_____

The date of Seller's receipt of the Purchase Price shall be referred to as the "Closing Date."

## 3   RIGHTS TO PROCEEDS

3.1   On or after the Closing Date, Purchaser shall be entitled to the proceeds of the Accounts.  Should Seller come into possession of any instrument or other property from an Account debtor in payment of an Account on or after the Closing Date, pursuant to this Agreement, Seller shall monthly endorse said instrument in favor of Purchaser or transfer to said other property to Purchaser and shall deliver said instrument or other property to Purchaser within a reasonable period of time following Seller's receipt of same.

3.2   Seller hereby authorizes Purchaser to endorse, in Seller's name, and to negotiate or deposit to any bank account maintained by Purchaser, any instrument payable or endorsed to Seller and received by Purchaser from or on behalf of an Account debtor on or after the Closing Date, in payment of an Account.

## 4   REPRESENTATIONS OF SELLER

4.1   Seller is a Mississippi Limited Liability Company duly organized and validly existing under the laws of said state.

4.2   Seller warrants that it is the owner of the Accounts.

4.3   Accounts are valid, binding, and enforceable obligations. Seller has good and marketable title to the Accounts, and has the right to sell, convey, and assign the Accounts.

4.4   Seller has taken all action necessary to authorize its execution and delivery of this Agreement and the performance of the transaction contemplated hereby.

4.5   Any Accounts which have been discovered to be bankrupt or have an active bankruptcy filed or are deceased prior to the Closing Date shall not be included as part of the Accounts contemplated by this Agreement. If any Accounts are determined to be bankrupt or deceased, Purchaser's sole remedy shall be limited to Seller's repurchase of such Accounts for the purchase price thereof less any recoveries on such accounts that Purchaser may have received, or for which a credit was given to Purchaser.  The Purchaser shall have a period of forty five (45) days from the Closing Date to return bankrupt and deceased Accounts to Seller for repurchase.  Seller shall not be required to repurchase any

Accounts returned by Purchaser to Seller after forty five (45) days from the Closing Date.

4.6     Any money received by Seller on any Accounts after the  Closing Date shall be transferred by  Seller to  Buyer by statement following the end of the month.    In order to assist Buyer in determining the Accounts for which the foregoing payments were made, Seller shall also monthly provide Buyer, along with the referenced payments, a list setting forth: (i) the names of the Account debtor who tendered payments; (ii) the Account debtors' account numbers; and (iii) the amount of the Account debtors' payments.

4.7     To the extent available, and upon written request of Purchaser, Seller will provide Purchaser the type of Account debtor information outlined in Exhibit "B" hereto on each purchased Account.

4.8     Seller makes no warranties, either oral or in writing, expressed or implied, concerning the Accounts other than as specifically set forth in this Agreement.  Seller makes no representations as to the percentage of collections or dollar amount, if any, to be collected on the Accounts. Seller may provide Buyer basic demographic data, including name, address, telephone number(s), social security number, date of birth, property ownership and other information.   To the best of sellers knowledge, the Account data is materially accurate and complete but in no way represents that it may be the basis for successful collection efforts, but merely represents information in Seller's possession.

4.9     Seller agrees to refund any Account that is found by Purchaser, WITHIN 45 days of the Closing Date,  not owed by the Account debtor due to fraud, as evidenced by an affidavit from the Account debtor or other evidence reasonably acceptable to Seller evidencing such fraudulent activity. Any account that was the subject of a consumer dispute while owned by the seller has been responded to or validated. Any Accounts that are not owed due to proper settlements verified in writing by the Originator (as defined below), Seller or agent thereof, or a copy of the canceled, final check (front and back) evidencing payment of the Account in full, will be refunded to Purchaser, when submitted in writing to Seller, for a period of time not to exceed forty five (45) days from the Closing Date.

5       REPRSENTATIONS OF THE PURCHASER

5.1     All recovery efforts instituted in connection with the Accounts shall be conducted in a good, lawful and expeditious manner.  The collection activities performed by Purchaser shall be in compliance with the Federal Trade Commission standards on debt collection and other

applicable state, federal and common law doctrines or laws reasonably ascertained as of the date hereof including but not limited to the Fair Debt Collections Practices Act, Fair Credit Reporting Act, and Telephone Consumer Protection Act.  In this regard, Purchaser and Seller each guarantee and agree to defend each other with respect to, and indemnify each other and hold each other, including but not limited to its employees, agents, officers, and assigns harmless from all claims, causes of action, damages, fines, penalties or costs of whatsoever nature, including reasonable attorney's fees arising from any action instituted against the other for a violation or claimed violation of law.  Purchaser will strictly adhere to all requirements of the Fair Debt Collection Practices Act, Fair Credit Reporting Act, Telephone Consumer Protection Act, and any other applicable collection, credit or credit reporting laws. For any accounts where the statute of limitations has run, purchaser will not falsely represent that a lawsuit will be filed if the obligor does not pay. Purchaser acknowledges and understands that Seller's inducement to sell the Accounts is based upon such representations.

5.1(a)   Licensing: Purchaser affirms that it is has obtained any license(s), bond(s), registration(s) or permit(s) required by applicable laws and regulations to engage in purchase, management, and collection of Accounts, and Purchaser shall keep all such license(s), bond(s), registration(s) or permit(s) in full force and effect throughout the term of the Agreement.  Upon demand of SCS, Purchaser shall provide SCS with copies of all current license(s), bond(s), registration(s) or permit(s) required by applicable laws and regulations to engage in purchase, management, and collection of Accounts, and to conduct business in every state in which Purchaser operates.

5.2   Purchaser is a Certified Professional Receivables Company through RMA International or meets or exceeds the standards of a Certified Professional Receivables Company and will provide sufficient proof to seller if such request is made.  RMA Standards available upon request or at www.rmassociation.org.

5.2(a)   Confidentiality of Consumer Information: Purchaser affirms that appropriate data security controls and policies are in place to protect and secure confidential consumer information and that confidential consumer information shall not be disclosed or used for any purpose other than expressly provided for in the Agreement. Purchaser also affirms that confidential information is appropriately destroyed in accordance with purchaser's document retention policies.

5.3   Purchaser shall provide to Seller a copy of any bankruptcy notices on Accounts which Purchaser seeks to have Seller repurchase including,

Buyer's Initials_____

but not limited to, date of filing of bankruptcy petition, bankruptcy case number, bankruptcy court in which case filed, and type of bankruptcy. For deceased Accounts for which Purchaser seeks reimbursement from Seller, Purchaser shall provide to Seller a death certificate including date of death for deceased Account debtor. Purchaser may also provide Seller with notice of bankruptcy on an Account, including date of filing of bankruptcy petition, either from BANKO or a national credit reporting agency. In the case of a deceased Account debtor, the referenced report must contain the date of death of the Account debtor.

5.4     Purchaser has such knowledge, sophistication and experience in business and financial matters as to be capable of evaluating both the information made available with respect to the Account/Related Materials and the merits and risks of the prospective purchase, is able to bear the economic risk of such purchase, is able to bear the risk that Purchaser may be required to hold the Account/Related Material for an indefinite period of time and is able to afford a complete loss of the purchase price for the Account/Related Materials. Purchaser expressly acknowledges and agrees that Seller cannot guaranty the collection of any Account.

5.5     Purchaser has been afforded the opportunity: (i) to ask such questions as it has deemed necessary of, and to receive answers from, representatives of Seller concerning the terms and conditions of the offering of the Accounts and the merits and risks of buying the Accounts; and (ii) to obtain such additional information that Seller possesses or can acquire.

5.6     Purchaser may not sell or transfer any Charged-off Account to any Third Party Buyer without first receiving written approval from Seller. Purchaser shall conduct commercially reasonable and prudent due diligence on such RMA Certified Third Party Buyers, and or buyers that meet or exceed the RMA Certification standards and shall defend, indemnify and hold harmless Seller and Prior Holders from any and all causes of action, claims, expenses or judgments incurred by Seller for which a Third Party Buyer is partially or solely responsible.

5.7     Under no Circumstances shall Purchaser be permitted to contact either the Originator and/or previous owner of the Accounts or bank (collectively and individually referred to as "Originator) by subpoena or otherwise for any reason without first obtaining Seller's express written consent.

5.8     *Enforcement; Legal Actions.* Purchaser or its Affiliates, successors, employees, servicing agents or assigns shall not take nor indicate or imply that it will or may take any legal enforcement action against any Obligor

and Purchaser shall not misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Obligor the identity of Purchaser, to the owner of the Accounts.  Purchaser shall not use, adopt, exploit, or allude to Seller or any servicing agent or any name derived there from or confusingly similar therewith or the name of any other local, state or federal agency or association to promote Purchaser's sale, enforcement, collection, or management of the Accounts.  Seller may seek the entry of an order by a court of competent jurisdiction enjoining any violation of this Section 4.7.  Notwithstanding the foregoing, Purchaser may use the name of Seller for the sole purposes of identifying any Account in communications with Obligor in order to collect amounts outstanding on the Account, in connection with sale of the Account, or as required by law, rule (including court decrees) or regulation.  Purchaser shall not represent that there is an affiliation or agency relationship between Purchaser and Seller, nor shall Purchaser state or represent in any way that Buyer is acting on behalf of the Seller. Out of an abundance of caution, Purchaser or its Affiliates, successors, employees, servicing agents or assigns shall not initiate any lawsuit or file suit on any Account in this Account pool to collect on any Debt.

## 6      MISCELLANEOUS

6.1     This Agreement is entered into, and shall be construed in accordance with the laws of the State of Mississippi.  Any action arising out of, or pertaining to this Agreement, shall be commenced only in a court of competent jurisdiction in Lafayette County, Mississippi, to the exclusion of all other venues.  The parties hereto further agree that in the event of any dispute regarding this Agreement, the courts of the State of Mississippi shall have and be vested with personal jurisdiction of the parties to this Agreement.

6.2     Media to be provided within 60 days of close at no cost.  Additional media, to the extent reasonably available, will be provided to Purchaser upon written request from Purchaser to Seller.  Media is available for a period of twelve months from the Closing Date at a charge of $12.50 per requested document. Document is defined as, among other things, affidavit. Said requests shall be prepaid at the time of each request. Media will be removed from Seller's server ninety (90) days after delivery of the Accounts to Purchaser.  Purchaser acknowledges and agrees that Seller will perform its best efforts to obtain requested media documentation from the Originator. Purchaser further acknowledges and agrees that media is extremely limited, if at all available, on the Accounts.  Purchaser acknowledges and agrees that Seller, despite its best efforts, may not be able to provide any media to Purchaser. Nevertheless, Purchaser specifically acknowledges and agrees that it

6

shall first make any and all requests for media directly to Seller.  Any request for media first made by Purchaser to any other entity than Seller shall be considered to be a breach by Purchaser of a material term of this Agreement.

6.3     Purchaser and any permitted assignee of Purchaser shall  not use or refer to the name of the Originator or Seller, or any similar name for any purpose relating to any Account including, without limitation, the collection, promotion, marketing, advertising, sale or transfer of any Account.  In collecting the Accounts, Purchaser shall only use its own name and shall not imply that it is connected or related in any manner with, or acting on behalf of, any person or entity operating under any of the foregoing names.  However, Purchaser and permitted assignees of Purchaser may use the name of the Originator and Seller solely for the purposes of identifying the Account in communications with an Account debtor on such Account in identifying it, in connection with litigation with an Account debtor or in connection with entering into any servicing arrangement in identifying the Accounts.  In contacting an Account debtor, filing suit, or selling the Accounts, Purchaser shall not state or represent in any way that it is taking such action on behalf of any of the aforementioned entities or their affiliates or assigns.

6.4     Seller has the right to recall an account from Purchaser  at any time for any reason should the Seller's client recall such account(s) from Seller.  The Purchaser  will be reimbursed its  purchase price for such account.  Such recalls are expected to be completed by seller within 48 hours of such request.
_____**Buyers Initials**

6.5     In the event Purchaser fails to pay Seller the full Purchase Price on or before the Closing Date,  (i) Purchaser shall be in breach of this Agreement, (ii) this Agreement may be terminated by Seller, effective immediately upon written notice to Purchaser, (iii) Upon termination of this Agreement due to Purchaser's default, Purchaser shall have no interest whatsoever, legal, beneficial or otherwise, in the Accounts, receivables, Receivable Schedules, and Account documents, (iv) Purchaser acknowledges that the actual damages likely to result to Seller from breach of this Agreement by Purchaser are difficult to estimate on the date of this Agreement and would be difficult for Seller to prove.  The parties intend that Purchaser's payment of liquidated damages in the amount of ten percent (10%) of the Purchase Price (the "Liquidated Damages Amount") would serve to compensate Seller for any breach by Purchaser of its obligations under the Agreement, and they do not intend for it to serve as punishment for any such breach by Purchaser; and (v) Seller shall retain all rights and remedies to which it is entitled

by law or under this Agreement, including those described in Section 6.5 hereof.

6.6    Purchaser acknowledges that Purchaser's breach of sections 5.6 and 5.7, or any other provision of this Agreement, will result in actual and substantial damages to Seller and/or Originator, the amount of which will be difficult to ascertain with precision. Therefore, if Purchaser breaches sections 5.6 or 5.7 of this Agreement, Purchaser will be liable for payment to Seller and/or Originator the sum of $1,000 for each such breach as liquidated damages and in preventing Purchaser's further breach of this Agreement.

6.7    Purchaser warrants and represents that it shall maintain at all times or as long as collection efforts continue on the Accounts purchased hereunder, whichever is later, a phone number for consumers to contact Purchaser or Purchaser's servicer with a live voice response during the business hours no less than 8a.m. to 6p.m., Monday through Friday (except Federal Holidays) in the time zone buyer is located. Should an Obligor purchased hereunder call Security Credit Services, LLC after Security Credit Services, LLC previously directed the same Obligor to Purchaser's number listed below and noticed Purchaser in writing of such difficulty, to Obligor's inability to get a live voice from Purchaser's Entity or its Servicer, Security Credit Services, LLC shall handle the call as it deems necessary. Should a collection be made, Security Credit Services, LLC shall retain a 50% collection fee of all gross monies collected and remit to Purchaser the remaining funds.

All Obligors shall be directed to contact Purchasers at the number below:

_____    Initial_____

6.8    Should any accounts within the current sale file be "Citibank, N.A" accounts (identified by Seller), Purchaser agrees to obtain get approval from Convoke Systems and all media requests will flow through Convoke Systems via its website (http://www.convokesystems.com/)

6.9    Interest. Purchaser shall not charge or collect interest accrued after the Closing Date on any Account. Nothing herein shall prohibit Purchaser from (i) pursuing claims for prejudgment or post-judgment interest in any legal action to collect on an Account, or (ii) pursuing collection efforts on any judgment arising there from to the extent permitted by applicable law.

6.10   Audit. Purchaser shall permit Seller or a duly assigned representative to perform audits at Purchaser's offices for the purpose of ensuring performance of the Agreement and compliance with applicable law. Such audits may be conducted at intervals deemed reasonably

8

necessary by Seller, and with reasonable prior notice, during normal business hours.

6.11   <u>From time to time Seller may receive updated terms from the Original Seller of the Accounts</u>. Any such changes required by the Seller's Original Seller shall flow through to the Purchaser should any accounts within this sale pool be affected. Purchaser agrees to honor any such requests and make any requested changes within 48 hours of notice and comply with such changes.

9

Buyer's Initials_____

This Agreement constitutes the entire understanding between Seller and Purchaser.  Neither party has made any representations, warranties or promises except as set forth herein.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

Security Credit Services, LLC
2653 West Oxford Loop, Suite 108
Oxford, MS 38655


_____

Kaye Dreifuerst, President




Michael Haynes & Associates, LLC
21 Brook St. Suite 9
Seekonk, MA 02771


_____

Michael Halzel, President

10

**Exhibit A**

ASSIGNMENT AND BILL OF SALE

Security Credit Services, LLC ("Seller") has entered into an Accounts Purchase Agreement, dated June 29, 2018 ("Agreement") for the sale of Accounts described in Agreement thereof to Michael Haynes & Associates, LLC. ("Purchaser"), upon terms and conditions set forth in that Agreement.

NOW, THEREFORE, for good and valuable consideration, Seller hereby sells, assigns, and transfers to Purchaser all of Seller's rights, title, and interest in each and every one of the Accounts described in the Agreement, provided however such transfer is made without any representations, warranties, or recourse.

IN WITNESS WHEREOF, Seller has signed and delivered this instrument on the _____ day of _____, 2018.

Security Credit Services, LLC

By:   _____
        President

Buyer's Initials_____

**Exhibit B**
**Closing Statement**

| | |
|---|---|
| **Type of Debt** | Commercial |
| **Originating Lender(s)** | TP |
| **Number of Accounts** | TBD |
| **State(s)** | Nationwide |
| **Face Amount (Book Value)** | $TBD |
| **Sale Price** | $TBD |
| **Closing/Funding Date** | July 30, 2018 |
| **Reference** | **SCS ~ MHA TP FF 6.29.2018** |

12

Buyer's Initials_____

**Exhibit C**

Wire Transfer Instructions

The Citizens Bank
1110 Central Drive
Philadelphia, MS 39350
601-650-0067

Security Credit Services
Operating Account
2653 W Oxford Loop, Ste 108
Oxford, MS  38655-2929
**Wire ABA # 065302154**
**Account # 2578763**

Reference: **SCS ~ MHA TP FF 6.29.2018**

Please include this information on all wire transfers.  If there are any questions, please
call us. Thank you.

Buyer's Initials_____

**EXHIBIT 14**

## Michael Halzel

| | |
|---|---|
| **From:** | Kaye Dreifuerst [kdreifuerst@securitycreditservicesllc.com] |
| **Sent:** | Friday, July 20, 2018 10:02 AM |
| **To:** | Michael Halzel |
| **Cc:** | T.K. Kimmel |
| **Subject:** | RE: Follow Up |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Michael,

Thank you so much for showing us a bit of RI. I loved my Little Necks at lunch – they are my favorite and not easy to find!

I'll send you an email on Monday in reference to the legal criteria that I'll get approved with the Client. With this change, I think this product will work really well for both your group and mine – as long as we don't receive any serious complaints, the client will continue to sell to SCS on a repeated basis.

Have a good week end and please tell your Dad I really enjoyed the lunch and conversation as well.

Regards,
Kaye

P.S. I wore my hat jogging this morning – I love it!

---

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Thursday, July 19, 2018 5:30 PM
**To:** Kaye Dreifuerst <kdreifuerst@securitycreditservicesllc.com>; T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** Follow Up

Kaye + T.K.,

Thanks for stopping in to little ole Rhode Island for the visit we appreciate it.

I forgot to mention that now that we are confident in the removal of the "non-legal" portion of the contract that we will likely be purchasing the 25 million we have in our forward flow contract in the next 90 days. I also wanted to discuss and explore options for continuing a relationship with this product beyond the 25 million we purchased and the remaining 25 we currently have in flow.

Hope you both have safe and easy flights home and look forward to continuing this conversation.

Sincerely,


**Michael Halzel**
**President**
**Michael Haynes & Associates, LLC**
**508-639-9953**

**EXHIBIT 15**

**Michael Halzel**

| | |
|---|---|
| **From:** | T.K. Kimmel [tkkimmel@securitycreditservicesllc.com] |
| **Sent:** | Friday, October 12, 2018 12:48 PM |
| **To:** | Michael Halzel; Kaye Dreifuerst |
| **Subject:** | RE: hey |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Yes there is an update

This is on the agenda for our face to face in Boston November 5th after we leave you in Foxborough.

I know it's not the immediate green light we/you are looking for but it is something they want to get into a little deeper face to face.

TKK

**From:** Michael Halzel <michaelhalzel@contactmha.com>
**Sent:** Thursday, October 11, 2018 1:31 PM
**To:** Kaye Dreifuerst <kdreifuerst@securitycreditservicesllc.com>
**Cc:** T.K. Kimmel <tkkimmel@securitycreditservicesllc.com>
**Subject:** RE: hey

T.K. & Kaye,

I was wanting to see if there was any update on the "legal criteria" with Time Payment.

I thought in August that we were close to getting the revision on our contract to ok litigation.

I am starting to get nervous as I am continuing to buy more of this each month.

Thanks,

Mike

**From:** Kaye Dreifuerst [mailto:kdreifuerst@securitycreditservicesllc.com]
**Sent:** Thursday, October 11, 2018 1:49 PM
**To:** Michael Halzel
**Subject:** Re: hey

I did not. Send it to Tk and myself.

Sent from my iPhone.

On Oct 11, 2018, at 9:54 AM, Michael Halzel <michaelhalzel@contactmha.com> wrote:

> Hey Kaye,
>
> Did you get my email yesterday regarding the update on legal with Time Payment?